1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                   FOR THE EASTERN DISTRICT OF CALIFORNIA

9   WILBERT TERRY,

10              Petitioner,                     No. CIV S-04-2479 WBS JFM P

11       vs.

12   JEANNE WOODFORD,

13              Respondent.                     FINDINGS AND RECOMMENDATIONS

14   _____/

15              Petitioner is a state prisoner proceeding through counsel with a petition for writ of

16   habeas corpus pursuant to 28 U.S.C. § 2254.  In 1981, petitioner pled guilty to second degree

17   murder with a firearm use enhancement and was sentenced to a prison term of seventeen years to

18   life.  (Resp't Ex. A, Abstract of Judgment.)[1]  In the instant action, petitioner challenges the

19   2003 decision by the California Board of Prison Terms (BPT) finding him unsuitable for parole.

20   This was petitioner's sixth suitability hearing; his first parole hearing was held in 1985.

21   (Petition, at 7(d), n.3.)  After carefully reviewing the record, the court recommends that the

22   petition be denied.

23   _____

24          [1]  In his petition, petitioner claims he was sentenced to 15 years to life.  However, his 15
     years to life sentence for second degree murder was enhanced by 2 years based on the firearm
25   use.  (Id.)  In addition, the abstract of judgment provides that "the court recommends to state
     prison that [petitioner] not be released at the minimum date of 17 years," and that petitioner "be
26   punished in the state prison for the term of 17 years to life."  (Id. emphasis in the original.)

ANALYSIS

I.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the  "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

/////

/////

1   The court looks to the last reasoned state court decision as the basis for the state

2   court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).[2]  Where the state court

3   reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

4   habeas court independently reviews the record to determine whether habeas corpus relief is

5   available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

6   II.  Procedural History

7   Petitioner filed a petition for writ of habeas corpus in the California Supreme

8   Court on December 24, 2003, which was summarily denied on October 13, 2004.  (Resp't's Ex.

9   D.)

10   Petitioner filed the instant action on November 22, 2004.

11   III.  Jurisdiction

12   Respondent argues that California law does not give rise to a federally protected

13   liberty interest in parole release.  The Ninth Circuit rejected this argument.  Sass v. California

14   Bd. of Prison Terms, 461 F.3d 1123 (9th Cir. 2006).

15   IV.  Background

16   The factual background of petitioner's offense is relevant to the analysis of

17   petitioner's claims.  None of the state court opinions included a factual summary.  Respondent

18   provided a copy of the probation report which included a detailed statement of the facts

19   underlying petitioner's conviction:

20           On January 5, 1981[,] approximately 6:30 p.m., the victim, Diane
            Higgins, and her boyfriend, Gregory Roberson[,] were westbound
21           on Century Boulevard in the number one lane.  The victim was
            driving a 1978 Chevrolet Camaro with Roberson riding in the front
22           passenger seat.  The victim stopped for the traffic signal at
            Figueroa Street and her vehicle was bumped from the rear.
23           Gregory Roberson looked back and observed [petitioner] and an
            unknown female in a copper-brown or gold colored Monte Carlo

24

25           [2]  When reviewing a state court's summary denial of a claim, the court "looks through"
    the summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234 F.3d 1072,
26   1079 n.2 (9th Cir. 2000).

behind them.  Roberson informed the victim of his observation. The victim, in fear, pulled into the left-turn lane for southbound Figueroa.  [Petitioner] maneuvered his vehicle and into the oncoming eastbound Century Boulevard to block off victim's vehicle.  [Petitioner] struck an unknown westbound vehicle during this maneuver.  The victim, in fear of [petitioner][,] turned her vehicle and accelerated northbound, on Figueroa Street with [petitioner] in pursuit.  The victim turned eastbound on 99th Street and after making the turn her car was rammed by [petitioner]. [Petitioner's] vehicle careened into a parked vehicle.  The victim, believing [petitioner's] vehicle was disabled, continued to her residence at 810 East 87th Place.  She parked her vehicle in the driveway and she and Gregory Roberson moved his vehicle from the street and parked behind the victim's vehicle.  The witnesses's vehicle was partially blocking the sidewalk because of the victim's failure to park far enough into the driveway.  The victim and Roberson entered the residence and informed her parents, Hubert and Marie Higgins, of what had occurred.  The victim, her parents and Roberson went out and viewed the damage to the vehicle.  The parties all returned into the residence.  Gregory Roberson was attempting to place a telephone call when the victim stated she was going to move her car further into the driveway so that he could move his vehicle up.  The victim exited the residence and a short time later yelled, "Greg, he's trying to kill me," and the statement was repeated about three times.  Three shots were heard.  After a short time, witness Hurbert Higgins Jr. exited the rear residence and observed the victim, his sister, on the driveway between the Camaro and the pickup.  The witness observed a gold-colored Monte Carlo westbound at the intersection of 87th Place and McKinley.  The Monte Carlo turned northbound on McKinley and drove out of sight.  Hurbert Higgins Jr. picked up the victim and carried her to the northwest bedroom and placed her on the floor. He then called the police and an ambulance.  The victim was pronounced dead at 7:10 p.m.  Several southeast division police units responded to the scene.  After a short period of time officer Yarnell answered the ringing of the telephone.  The following conversation took place between Officer Yarnell and the caller. Male voice: "Is Diane there?"  Officer Yarnell:  "Who's this?" Male voice:  "Is she dead?  I hope she's dead because I've been looking for her for awhile!"  Officer Yarnell: "Is this Terry?" (Officer Yarnell had knowledge of the possible suspect's name.) Male Voice: "That's right mother fucker, and you've got to come and catch me.  You've got to find me."  The male hung up and terminated the conversation.

On January 5, 1981 the witness Trina Parks picked [petitioner] up at "Red's" Liquor Store on Century and Main in her vehicle, a 1976 Monte Carlo, tan and light brown.  [Petitioner] was driving westbound on Century and Figueroa where he stopped behind the victim in traffic.  [Petitioner] bumped the rear of the victim's vehicle.  The victim drove into the left-turn lane and [petitioner]

4

1       drove to the left of the victim stating "I've got to talk".  The victim
turned eastbound on 98th where [petitioner] rammed the rear left
2  side of the victim's vehicle and attempted to push the victim's
vehicle to the curb.  The victim managed to drive her vehicle away
3  and [petitioner] crashed into a parked vehicle.  The witness blacked
out and upon awakening observed [petitioner] was gone.  The
4  witness made a traffic report and had her vehicle towed to "Tow-
Masters" Garage.  On January 5, 1981, at 11:15 p.m. [petitioner,]
5  in the company of his attorney[,] surrendered himself at the West
Los Angeles Station.  An officer of the Southeast Division
6  responded to the West Los Angeles Station and took possession of
[petitioner] where he was transported and arrested at the Southeast
7  Division.

8  (Resp't's Ex. C, filed February 14, 2005, at 10-13.)  The BPT read the facts from the probation

9  report as quoted above.  (Resp't's Ex. B, BPT opinion at 11-15.)  Petitioner admitted that the

10  facts were true as stated, with the exception that he did not drive his car to the victim's home, but

11  rather ran the distance between where the car was totaled on 99th and Figueroa to the victim's

12  home on Central, a distance of several blocks, about a mile and a half.  (Id., 15-16.)

13  V.  Petitioner's Claims

14       A.  Some Evidence

15       Petitioner contends that he has demonstrated exemplary behavior and evidence of

16  rehabilitation, thus "the continuous denial of parole, simply because of the nature of petitioner's

17  offense, prior criminal history[,] and while in the institution, petitioner programmed in a limited

18  manner and since his last Board hearing he received a counseling chrono and that the psychiatric

19  report dated 8-20-99 was not totally supportive of release[,] clearly violated petitioner's liberty in

20  parole."  (Petition at 7(d).)  Petitioner contends the denial of parole was not supported by some

21  evidence.  (Traverse at 8.)  Respondent argues there was sufficient evidence to support the BPT's

22  decision.

23       In the parole context, the requirements of due process are met if "some evidence"

24  supports the decision."  Id. at 1128-1129.  In reviewing the BPT decision, the court analyzes

25  whether the factors relied on by the BPT, set forth in the relevant regulations, are supported by

26  /////

5

1    some evidence.  Cal. Code of Regulations, § 2402(c), sets forth the circumstances tending to

2    show unsuitability.

3            In Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003) the Ninth Circuit indicated that

4    a continued reliance on an unchanging factor such as the circumstances of the offense could

5    result in a due process violation.  Biggs was serving a sentence of twenty-five years to life

6    following a 1985 first degree murder conviction.  In the case before the Ninth Circuit, Biggs

7    challenged the 1999 decision by the BPT finding him unsuitable for parole despite his record as a

8    model prisoner.  Id., 334 F.3d at 913.  While the Ninth Circuit rejected several of the reasons

9    given by the BPT for finding Biggs unsuitable, it upheld three:  1) petitioner's commitment

10   offense involved the murder of a witness; 2) the murder was carried out in a manner exhibiting a

11   callous disregard for the life and suffering of another; 3) petitioner could benefit from therapy.

12   Id., 334 F.3d at 913.

13           The Ninth Circuit cautioned the BPT regarding its continued reliance on the

14   gravity of the offense and petitioner's conduct prior to the offense:

15                   As in the present instance, the parole board's sole supportable
                     reliance on the gravity of the offense and conduct prior to
16                   imprisonment to justify denial of parole can be initially justified as
                     fulfilling the requirements set forth by state law.  Over time,
17                   however, should Biggs continue to demonstrate exemplary
                     behavior and evidence of rehabilitation, denying him a parole date
18                   simply because of the nature of his offense would raise serious
                     questions involving his liberty interest.
19

20   Id., 334 F.3d at 916.

21           Here, the BPT identified several factors supporting its decision to find petitioner

22   unsuitable for parole:

23           1.  The offense was carried out in a very cruel manner.  (Answer Ex. B, BPT

24   Decision, at 59; Cal. Code Regs. tit. 15, § 2402(c)(1).  The offense was carried out in a manner

25   demonstrating an exceptionally callous disregard for human suffering.  (Answer, Ex. B,

26   Decision, at 59; Cal. Code Regs. tit. 15, § 2402(c)(1)(D).)

1    2.  The motive of the crime was very trivial in relation to the offense in that the

2  motive appeared to be jealousy.  (Answer, Ex. B, Decision, at 59, 17; Cal. Code Regs. tit. 15,

3  § 2402(c)(1)(E).)

4    3.  On previous occasions, petitioner "inflicted or attempted to inflict serious

5  injury on a victim, and has a record of violence or assaultive behavior, an escalating pattern of

6  criminal conduct and violence and has a history of unstable and tremulous relationships with

7  others.  (Answer, Ex. B, Decision, at 59-60.)

8    4.  Petitioner failed previous grants of probation and . . . parole and failed to profit

9  from society's previous attempts to correct his criminality.  (Id., Decision, at 60.) Those attempts

10  included juvenile camp, juvenile probation, county jail, adult probation and a prior prison term

11  and parole.  (Id.)

12    5.  Petitioner has an unstable social history and prior criminality which includes

13  the use of multiple types of drugs and drinking alcohol everyday.  Use of his drugs included

14  cocaine, trying speedball once, freebasing cocaine about three times a week and he tried heroin

15  once, and marijuana.  (Id.)

16    6.  Petitioner's previous criminal record supported a finding of unsuitability.  (Id.)

17  Petitioner admitted there were many other offenses which he committed for which he did not get

18  caught.  (Id.)  Petitioner was arrested and convicted of grand theft auto, battery, sales of

19  marijuana, voluntary manslaughter,[3] assault with a deadly weapon[4] and four burglaries.[5]  (Id.)

20  ───────────────

21    [3]  On June 21, 1970, petitioner stabbed Margaret Wilson, with whom he had been living, to death.

22    [4]  On July 2, 1979, petitioner was convicted of assault with a deadly weapon and burglary.
   Petitioner "surrendered himself and admitted that he broke into the victim's house and stabbed
23  her in anger."  (Resp't's Ex. C, Probation Report, at 7.)  The victim and petitioner had been
   planning to marry.  (Id.)
24
    [5]  Petitioner had also previously attacked Diane Higgins, the victim in the instant case.
25  (Resp't's Ex. C, Probation Report, at 8.)  Petitioner broke into Ms. Higgins' residence after she
   refused him entry, "began choking [her] with both hands around her neck and when she began
26  crying, started punching her in the face. . . .[he] began choking her again."  (Id.)  After she

7

1         7.   Petitioner had programmed in a limited manner while incarcerated.  (Id.; Cal.

2 Code Regs. tit. 15, § 2402(d)(9)(institutional activities indicate enhanced ability to function

3 within law upon release).)

4         8.   Petitioner failed to develop a marketable skill.  (Answer, Ex. B, Decision, at

5 60; Cal. Code Regs. tit. 15 § 2402(d)(8).)  Petitioner failed to upgrade educationally and

6 vocationally.  (Id.)  Petitioner had not sufficiently participated in beneficial self-help

7 programming.  (Id., Decision, at 60-61.)

8         9.   Petitioner had a counseling chrono since his last BPT hearing dated September

9 25, 2000 for unauthorized clothes.  (Id., Decision, at 61.)

10         10.   The "psychiatric, psychological report dated 8-20-99 authored by Dr. John

11 Saunders is not totally supportive of release in that the doctor says that he agrees with a previous

12 evaluator that psychotherapy is not likely to increase [petitioner's] understanding of the dynamics

13 that led to his criminal history.  And he believes that:

14         'Unfortunately some of these dynamics still exist and in contrast to
           the previous examiner I find that these may be relevant to future
15         parole considerations.  Also, unfortunately I do not know of any
           specific treatments which would have a high likelihood of
16         effectiveness.'"

17 (Id.)

18         11.   While petitioner does have a place to live upon parole, he does not have

19 acceptable employment plans and he does not have a marketable skill.  (Id.; Cal. Code Regs. tit.

20 15, § 2402(d)(8).)

21         12.   The District Attorney of Los Angeles County opposed petitioner's release.

22 (Resp't's Ex. C, Decision, at 61.)

23 /////

24

25 refused to put her clothes back on, petitioner "allegedly removed a small handgun from his right
   pants pocket and pointed it to the victim.  According to the preliminary transcript the gun
26 malfunctioned and did not fire."  (Id.)

13.  The correctional counselor indicated petitioner "still presents a moderate to low degree of threat if released to the public at this time."

The BPT made the following findings:

> [Petitioner's] gains are recent and he must demonstrate an ability to maintain gains over an extended period of time.  Nevertheless, we do want to commend [petitioner] for taking his – a 21-hour substance abuse therapy class and Square One Narcotics group and he has been working in culinary with average to above average work reports.  However, these positive aspects of this behavior do not outweigh the factors of unsuitability. . . . [Petitioner] committed the offense in an especially cruel manner and that specifically when he saw his girlfriend driving by in a car he took chase in his own car.  When his car was disabled, he grabbed a gun and ran a mile and a half to the house to – where he shot and killed her in the front yard.  This was a very deliberate act and one out of anger and jealousy.  The offense was carried out in a dispassionate and calculated manner and it was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering and the motive for the crime was very trivial in relation to the offense.  [Petitioner] has a record of violent behavior in that [petitioner] has been convicted of . . . assault with a deadly weapon.  He's been convicted of battery, he's had sales of marijuana, he's had a voluntary manslaughter where he did a prior prison term, and even after that he had an assault with a deadly weapon and an assault with a deadly weapon and burglary.  So he has a history of very violent behavior.  [Petitioner] has a history of unstable and tremulous relationships with others.  And the recent psychiatric, psychological report dated August 20, 1999 authored by Dr. Saunders indicates a need for a longer period of observation and evaluation or treatment.  [Petitioner] has not completed the necessary programming and he needs additional time to gain that programming.  He still has not completed his GED or any vocation and very, very little self-help.  Therefore, a longer period of observation and evaluation of [petitioner] is required before the Board should find [petitioner] suitable for parole.  We're just recommending that you remain disciplinary-free, and if available, upgrade vocationally and educationally, and if available, participate in self-help and we're asking that you cooperate with clinicians in the completion of a clinical evaluation.  So we are requesting that the psychologist take a look and do another evaluation and we will make . . . sure that that is done before you come before the Panel again.  Mr. Terry, you're going to need to work on your parole plans.  And if it is your thought that you'll be able to draw social security, you're not old enough yet to draw social security even at a minimum.  But you need to . . . to have a written plan . . . even from social security.  You need to write to them and have them respond to you and tell you whether or not you're even going to be eligible to draw social security because . . .

I don't know what you were able to contribute to social security before you came into prison.  So you need to do that.  You need to have your cousin see if she could check into some restaurants.  You need to write down what your skills and things are so that she will have something to be able to help you look for employment.  You know I appreciate your honesty that you had here today.  This was a horrible crime there was a lot of violence in your background, and we just need to make sure that we have everything covered as much as possible before a date can be given.  And I wish you good luck.

(Answer, Ex. C, Decision at 62-65.)

B.  Some Evidence Supports The BPT's Decision

The BPT identified myriad reasons for its decision to find petitioner unsuitable for parole, including the commitment offense, petitioner's pre-offense behavior, Dr. Saunders' recommendation for a longer period of observation and evaluation or treatment, failure to upgrade vocationally and educationally, and failure to participate in prison programming.

i.  Instant Offense

One of the circumstances tending to indicate unsuitability for parole is that the prisoner "committed the offense in an especially heinous, atrocious or cruel manner."  15 Cal.Code Regs. § 2402(c)(1).  The factors to be considered in determining whether that circumstance exists are that "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder," "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."  15 Cal.Code Regs. § 2402(c)(1).  The BPT considered a circumstance and factors proper under California law.

There was some evidence in the record to support the BPT's determination that the circumstances of the commitment offense indicated unsuitability.  The record supported a determination that murder was committed in a very cruel and callous manner in that petitioner first bumped the victim's car with his car then, after his car was rendered inoperable following the victim's efforts to escape in her car, petitioner got a gun and ran a mile and a half where he

10

1   gunned the victim down when she exited the house to move her vehicle.  The motive for the

2   killing, jealousy, was trivial.  The BPT identified more than the minimum elements of a second

3   degree murder when it determined that petitioner committed the murder in a very cruel manner as

4   shown by the completely unprovoked attack.  See Irons v. Carey, ___ F.3d ___, 2007 WL

5   656345 (9th Cir. 2007), quoting In re Dannenberg, 34 Cal.4th 1061, 1071 (Cal.), cert. denied,

6   126 S.Ct. 92 (2005).  The victim was merely driving down the street when petitioner saw her and

7   started the attack.

8                                    ii.  Pre-Offense Behavior

9               The BPT also relied on petitioner's pre-offense history for its determination that

10  he was not suitable for parole.  The record supported these findings.  Petitioner's criminal history

11  demonstrated an escalating pattern of violence which culminated in second degree murder.

12  Petitioner also had an unstable social history.  Consideration of petitioner's pre-offense history

13  was not improper.  An unstable social history is specifically listed as a circumstance tending to

14  indicate unsuitability, see 15 Cal.Code Regs. § 2402(c)(3).  Section § 2402(b) specifically allows

15  the BPT to consider a great range of relevant and reliable information, such as the prisoner's "past

16  criminal history, including involvement in other criminal misconduct which is reliably

17  documented."  Id.  Petitioner's prior conviction for manslaughter alone could be considered by

18  the BPT as tending to show unsuitability.

19              In his traverse, petitioner appears to argue that his prior manslaughter conviction

20  should not be taken into account because the degree of criminal culpability differs substantially

21  from that of murder.  (Id. at 2.)  However, respondent accurately portrayed petitioner as having

22  an "escalating history of violence and assaultive behavior."  (Answer at 4.)  Respondent was not

23  mischaracterizing petitioner's conviction for manslaughter; rather, respondent was noting

24  petitioner's crimes had progressed from battery to manslaughter to second degree murder.  (Id. at

25  2, Ex. C, Probation Report, at 5-8.)  Past criminal conduct is not an arbitrary factor that has

26  nothing to do with present dangerousness.  Recidivism concerns are genuine.  See Ewing v.

1    California, 538 U.S. 11, 26 (2003) (O'Connor J.) (noting a report stating that over 60% of violent

2    offenders were arrested again within three years of their release).

3                    iii.  Dr. Saunders' Report

4                    Petitioner argues that Dr. Saunders' report is inaccurate because "there is no

5    evidence that it was petitioner's mental state that caused him to commit this offense." (Traverse

6    at 3.)  However, a review of petitioner's prior criminal history reflects that most of his violent

7    episodes involved women with whom he was having or had a relationship, and his violence was

8    often based on jealousy or anger.[6]  The psychologist noted that while petitioner has a strong

9    history of assaultive behavior, he does not have any substance abuse problems that need to be

10   treated, and petitioner had "continuing improvement in antisocial and narcissistic personality

11   traits." (Resp't's Answer, Ex. B, Decision at 42-43.)  The panel noted that Dr. Saunders stated

12   that petitioner's

13               record in prison indicates a low level of dangerousness within a
             controlled setting, and [his] criminal record indicates a formerly
14           high level of dangerousness in relationships with women, which
             [he] believes has been somewhat mitigated by Anger Management
15           classes and increasing maturity, and particularly [petitioner's]
             willingness to admit that [he does] not need to control others.
16

17   (Id., Decision at 43.)  Dr. Saunders did go on to state that he agreed with the previous evaluator

18   that "psychotherapy is not likely to increase [petitioner's] understanding of the dynamics that led

19   to [his] criminal history and that unfortunately some of these dynamics still exist." (Id., Decision

20   at 44.)  Dr. Saunders also opined that he did not know "of any specific treatments which would

21   have a high likelihood of effectiveness." (Id.)

22   /////

23

24              [6]  An earlier psychological evaluation also supports this connection.  In 1990, petitioner
        was diagnosed with impulse control disorder.  (Resp't's Answer, Ex. F, part 3 [Docket No. 12-12
25      at 1-2].)  Petitioner's "current problems with females appear to stem from his early childhood
        relationships with his own mother and stepmother." (Id.)  Petitioner "exhibited hostile, insecure,
26      jealous, and violent eruptions in relationships with women and this needs to be addressed in one-
        on-one therapy." (Id.)

1    The BPT compared Dr. Saunders' caution in 1999 with the correctional

2    counselor's view that, four years later, petitioner had made progress and would pose only a

3    "moderate to low degree of threat to the public if released from prison at this time." (Id.,

4    Decision, at 44-45.)

5    The court notes Dr. Saunders' report was not current as of the 2003 hearing,

6    particularly given comments during the hearing that petitioner's improved behavior and affect

7    were recent ("your counselor four years later says you've been working and making progress," id.

8    at 45; "more relaxed and in control in 2002." Id. at 47.)  The BPT would be well-advised to have

9    benefit of a current psychological report at petitioner's next parole hearing.

10                    iv.  Failure to upgrade vocationally[7] and educationally

11    Petitioner contends he has "marketable skills to use upon release." (Traverse at

12    2.)  However, petitioner has failed to explain what those skills are or support his claim with

13    evidence.  At the BPT hearing, petitioner stated "If I get a date and if I get out, I will cook, I will

14    meet that challenge." (Resp't's Answer, Ex. B, Decision at 49.)  Petitioner noted that Ms.

15    Weaver was going to open up a store and he would probably work for her, or his cousin would

16    help petitioner get a job in San Francisco.  (Id.)  Petitioner added that in the past he has had job

17    offers that evaporated because he did not get paroled.  (Id.)

18    Although the BPT noted petitioner has been working in the culinary profession, it

19    also noted petitioner had not demonstrated any efforts to line up employment in that field should

20    he be granted a parole date.  If petitioner could be easily employed in any fast food restaurant as

21    his attorney suggested at the parole hearing (id. at 56), it should not be difficult to obtain

22

23          [7]  Petitioner states that "rehabilitation does not consist of finding employment prior to
24    parole in light that petitioner's case did not involve robbery." (Traverse at 13, n.2.)  However,
      Cal. Code Regs. tit. 15 § 2402(d)(8) provides that the BPT may consider petitioner's plans for the
25    future to determine whether petitioner is suitable for parole.  (Id.)  "Understanding and Plans for
      Future. The prisoner has made realistic plans for release or has developed marketable skills that
26    can be put to use upon release." (Id.)  There is no requirement that this factor be connected or
      related to the nature of the underlying crime.

1  documentation to support that claim at petitioner's next parole hearing.  Accordingly, the record

2  reflects some evidence supports the BPT's finding that petitioner had failed to upgrade

3  vocationally.

4           The BPT also found petitioner unsuitable because he had not adequately upgraded

5  educationally.  In particular, the BPT noted that petitioner had not obtained his GED.  Petitioner

6  stated that he completed the eleventh grade, dropping out of school to go to work.  (Answer, Ex.

7  B, Decision at 5; Ex. F, 1985 Psych Eval. [Docket No. 12-11 at 1.])  However, petitioner is now

8  65 years old.  If petitioner's intention is to seek a cooking job upon parole, it might be that a

9  GED would not be required.  However, because neither petitioner nor his attorney addressed this

10  issue at the hearing and petitioner failed to address it in the instant case, on this record it is

11  undisputed that petitioner has failed to obtain his GED.  Accordingly, the court finds that the

12  BPT's finding that petitioner was unsuitable for parole based on his failure to upgrade

13  educationally was supported by some evidence.

14           v.  Failure to Participate in Prison Programming

15           At the BPT hearing, the panel commended petitioner for taking a 21 hour

16  substance abuse therapy class and Square One Narcotics group.  (Resp't's Answer, Ex. B,

17  Decision, at 62.)  The BPT noted that petitioner "used [his] time wisely by disciplining [himself]

18  as an avid reader of self-help improvement books and an expressive writer."  (Id., at 47.)  The

19  BPT recommended that petitioner participate in self-help and therapy, if available.  (Id., at 36,

20  64.)  The panel suggested "there's several outreach programs that are available" to petitioner.

21  (Id. at 47.)

22           Petitioner has also taken anger management classes.  (Id., at 43.) Petitioner works

23  11:00 a.m. to 7:00 p.m. as a cook.  (Id. at 39-40.)  The record reflects petitioner does not have a

24  history of drug or alcohol addiction.  (Id., at 44.)

25           However, the BPT did not identify any specific program or therapy that would

26  assist petitioner, even qualifying their statement by saying "if available."  Given the lack of a

1  specific program recommendation and an affirmative statement that such a program or therapy is

2  available, this court cannot find that some evidence supports the BPT's finding that petitioner

3  had failed to participate in prison programming.

4       B. <u>Conclusion</u>

5       Considering the length of petitioner's incarceration (almost 26 years), his number

6  of suitability hearings (8) and his fine prison record, the court finds that these unchanging factors

7  have lost any predictive value in determining whether petitioner was suitable for parole.

8       On this record, as in <u>Biggs</u> and <u>Sass</u>, the BPT's decision that petitioner was

9  unsuitable for parole was supported by "some evidence" that bore "indicia of reliability."  As

10 noted above, this court finds that some evidence supported the BPT's conclusion that petitioner

11 was unsuitable for parole based upon the following:  his failure to upgrade vocationally and

12 educationally.

13      Contrary to <u>Biggs</u>, this is not a case where petitioner's due process rights are

14 implicated by repeated parole denials based upon continued reliance solely on the unchanging

15 factors of the commitment offense and conduct prior to imprisonment.  However, this could

16 change at the next parole hearing should petitioner have benefit of a current, positive

17 psychological report and present evidence that he has upgraded his skills educationally or

18 vocationally, including evidence of possible jobs he could hold post-parole or his qualification

19 for social security.

20      Petitioner is 65 years old and has been incarcerated for almost 26 years.  Petitioner

21 has expressed remorse for his actions.  (Resp't's Answer, Ex. B, Decision, at 20.)

22          I'm truly sorry. . . And after so many years in here – A person who
            say they don't think about their crime is a liar because I think every
23          other day, every day, every time I have time alone.  And I look at
            my photos and I think about it . . .and then they say no one ever
24          dies as long as you have them on your mind . . .and I think . . about
            her.  I think about her mother, her father, because we got along
25          good.

26 /////

1   (Id.)  Petitioner's current custody level is Medium A and his classification score is zero.  (Id., at

2   36.)  Given the positive improvement noted by petitioner's correctional counselor, petitioner's

3   consistent work history in prison, his continued history of being disciplinary-free, Dr. Saunders'

4   opinion that petitioner poses a low risk of violence upon parole, and his cousin's willingness to

5   offer him shelter upon parole, the BPT should not deny petitioner parole based solely on the

6   unchanging facts of petitioner's offense or pre-offense criminal history if petitioner remains

7   disciplinary-free and can adequately demonstrate his post-parole employment plans or

8   demonstrate his eligibility to receive social security benefits based on his age at the next BPT

9   hearing.

10         However, on the present record, this court cannot say that the record of

11   petitioner's May 22, 2003 suitability hearing is "so devoid of evidence that the findings of the

12   disciplinary board were without support or otherwise arbitrary."  Hill, 472 U.S. at 457.

13   Accordingly, petitioner should not be entitled to relief on his due process claim.

14         vi.  Remaining Issues

15         Petitioner contends a counseling chrono does not count as a CDC-115.  However,

16   the BPT's decision does not reflect that the panel considered the counseling chrono as a prison

17   disciplinary.  Rather, the panel recommended that petitioner "remain disciplinary-free," which

18   implies petitioner was considered to be disciplinary-free at the hearing.

19         Finally, petitioner contends that

20         the California Supreme Court has already decided that service of
         the minimum term is evidence of suitability for Parole release (In

21         re Rodriguez (1975) 14 Cal. 3d 639, 651), that the Board must set a
         proportionate term for petitioner (i.e., a uniform term) and that a

22         failure to set a term for petitioner is setting his commitment at the
         longest possible term–life in prison, which would be

23         disproportionate and evidence that a parole date should be set.

24   (Traverse, at 4.)

25         Petitioner was sentenced to seventeen years to life.  Petitioner has apparently

26   confused the minimum term necessary to be served before parole could be implemented at its

1   earliest, the minimum eligible parole date (MEPD), with a determinate sentence of seventeen

2   years.  Petitioner has already passed his MEPD, May 8, 1992, without any finding of parole

3   eligibility.  The BPT is not required to find petitioner even eligible for a parole setting within

4   seventeen years.  Petitioner could spend the rest of his life in prison without ever becoming

5   eligible for parole.

6          Section 3041 of the California Penal Code provides that one year prior to the

7   inmate's minimum eligible parole release date a panel consisting of at least two commissioners

8   of the BPT shall meet with the inmate and shall normally set a parole release date.  California's

9   parole scheme gives rise to a cognizable liberty interest in release on parole.  Biggs v. Terhune,

10  334 F.3d 910, 914 (9th Cir. 2003).  "In the parole context, the requirements of due process are

11  met if 'some evidence' supports the decision."  Id.  If there is not some evidence to support a

12  decision denying parole, due process is violated.  Therefore, even though California law states

13  that the BPT shall normally set parole release dates, due process does not require the BPT to state

14  a date where some evidence exists demonstrating that petitioner should not be paroled.

15         Petitioner's allegation that he is being subjected to excessive punishment is

16  unsubstantiated and cannot form the basis for an Eighth Amendment or a due process claim.

17  California Penal Code § 190(a) provides that "every person guilty of murder in the second degree

18  shall be punished by imprisonment in the state prison for a term of 15 years to life."  (Id.)

19  Petitioner is being treated as a prisoner who has been sentenced to a life sentence with the

20  possibility of parole but who has not yet been found suitable for parole.  The BPT hearing that is

21  the subject of this petition has been conducted for the purpose of determining when and if

22  petitioner will receive a parole release date.  Accordingly, he has not been treated as if parole

23  were not possible.  Further, petitioner's claim that the BPT is "required" to set a release date for

24  him is not supported by the law.  The BPT is required to set a release date only after a prisoner

25  has been found suitable for parole.  See Connor v. Estelle, 981 F.2d 1032, 1033 (9th Cir. 1992)

26  /////

17

1   (per curiam); California Penal Code § 3041(b).  Petitioner has not yet been found suitable for

2   parole; accordingly, the BPT is not required to set a release date for him.

3          Petitioner has also failed to establish that his sentence of life with the possibility

4   of parole constitutes cruel and unusual punishment.  Successful challenges to the proportionality

5   of particular sentences are "exceedingly rare."  Solem v. Helm, 463 U.S. 277, 289-290 (1983).

6   "The Eighth Amendment does not require strict proportionality between crime and sentence.

7   Rather, it forbids only extreme sentences that are 'grossly disproportionate' to the crime."

8   Harmelin v. Michigan, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring) (citing Solem v.

9   Helm).  The United States Supreme Court has held that it was not an unreasonable application of

10  clearly established federal law for the California Court of Appeal to affirm a sentence of two

11  consecutive 25 year to life imprisonment terms for a petty theft with a prior conviction involving

12  theft of $150.00 worth of videotapes.  See Lockyer v. Andrade, 538 U.S. 63, 75 (2003).  See also

13  Ewing v. California, 538 U.S. 11, 29 (2003) (holding that a sentence of 25 years to life in prison

14  imposed on a grand theft conviction involving the theft of three golf clubs from a pro shop was

15  not grossly disproportionate and did not violate the Eighth Amendment).

16          Petitioner's sentence is not inconsistent with the holdings of the United States

17  Supreme Court noted above.  The sentence imposed was within statutory limits for the offense

18  committed by petitioner and was not grossly disproportionate to the crime of conviction.  See

19  Andrade, 538 U.S. at 77.  See also Greenholtz v. Inmates of Nebraska Penal, 442 U.S. 1, 7

20  (1979) ("[t]here is no constitutional or inherent right of a convicted person to be conditionally

21  released before the expiration of a valid sentence").  Accordingly, petitioner is not entitled to

22  relief on this claim.

23          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

24  writ of habeas corpus be denied.

25          These findings and recommendations are submitted to the United States District

26  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED:  April 4, 2007.

UNITED STATES MAGISTRATE JUDGE

001; terr2479.157